Good morning, Your Honors. May it please the Court, my name is Ron Poirier. I'm appearing on behalf of Plaintiff and Appellant, Mr. Jason Nielsen, who is also President of the Court. In the brief time that I have here today, I'd like to focus on some of the arguments that were raised in the brief and in prior rulings by the District Court. Specifically, I'd like to focus on the retaliation aspect of the case and the wrongful termination initially. Our courts have found, both our State courts and our Federal courts have found that a plaintiff may demonstrate a pretext. This issue surrounds the termination and discrimination and retaliation against my client by his former employer. Right. What's your best evidence of pretext? My best evidence of pretext, Your Honor, there's a number of issues that I'd like to talk about regarding pretext. I mean, I'm just assuming for the sake of argument that the employer has established the legitimate nondiscriminatory reason. That's fine.  Thank you, Your Honor. I'll go straight to that, if you'll let me. Essentially, the employer here in this particular case offered as a pretext or as a justification for termination both an economic reason, which is related to the loss of a large contract, and my client's poor performance evaluation. So I'll take those separately. Initially, our courts ---- Couldn't they add to that list? Couldn't they also say, I thought the grounds for termination was that he hadn't returned from a leave and there was a dispute over whether he had gotten permission for the leave or not? I'll address that, too. Thank you, Judge. Essentially, our courts have found that an employer has to do more than just step up and allege that they're terminating an employee or getting rid of an employee for an economic reason. And that's the Davis case and the Guz case. And in here, that's what's lacking, one of the elements that are lacking here. They simply step up and say, based on some unforeseen circumstances, i.e., the loss of a contract, we're terminating Mr. Nielsen. But when you look at the evidence regarding the pretext issues that we're going to raise, it undermines the credibility and the statements of both the President and the company itself. When I took the President's deposition, I asked her repeatedly why they terminated my client. And each and every time, she said the primary reason was because he was on leave of absence. And focusing on the leave of absence issue, my client had subsequently had two leave of absences approved based on his emotional state and the harassment that he was experiencing. On December 15th, he applied and was approved for a third leave of absence. There's no dispute that the documents had been signed and authorized. What TTI says is that, well, that person who did it really shouldn't have done it. There's no indication that that person was not in a position to authorize that, that the company itself somehow precluded her from doing so. She was in the course and scope of her employment, acting in her official capacity, and granted my client a leave of absence. Fifteen days later, he was terminated. So that, I hope, answers the question regarding the leave of absence. They allege in the deposition of the President that the primary reason she got rid of my client was because of the leave of absence, which strikes as somewhat inconsistent and contradictory when it was already approved. Moving on, they also indicate that this contract that they had lost was a recent event and that the shakeup was somewhat of a last-minute thing. If you look at the facts as cited in the appellee's brief, the timeline does not support that. In September of 2008, they represent that they first were informed that they lost the contract. My client doesn't go out on medical leave until October of 2008. There's been no discussion of getting rid of him or anybody else at that point in time. He then goes out on a second medical leave of absence, and it isn't until November 18th when the employer and the President issues a memorandum. And when she indicates a number of reasons for the change, none of which are directly related to the economic impact. In fact, she states, and this is in our record at 200 and 204, three reasons for the reorganization, to allow for more operational flexibility, to properly align the people to get them in the right position, and then she refers to a two-month loss of a DLI contract. She then goes on to say that some committee of people had been working for several months on this issue. I find it vague and strikingly contradictory that they've been working on it for several months when they just found out in September that they were going to lose the contract. It continues. They did not lose the contract until December, long before or strike that, well after my client had applied for and was granted his medical leave of absence. In fact, in the documents that I just cited, 200 to 204, there's a document at page 203 where my client is indicated as an employee with a job assignment to be determined. I guess I'm more concerned about the retaliatory, the causal relationship between retaliation and the termination. The thing that puzzled me and I was sort of struggling with is, although Parker, Mr. Parker may have had a retaliatory motive and was trying to develop a case against your client, he was actually disciplined by the company. And the company says, you've really put us in a, I think, precarious position. I guess she meant precarious position. Because you haven't done what's necessary to go through our progressive discipline function and to give the, Mr. Nielsen, an opportunity to improve. And so you're being demoted. And then ultimately, I guess, he resigned under pressure. And so the question is, why is Parker's retaliatory motive imputed to the company here? Help me understand that. Yes, Your Honor. First of all, this evaluation that you're talking about occurred long after my client had been terminated. And so these issues ---- But for Mr. Parker, right? Mr. Parker, correct. My client was terminated in December. These issues that were raised ---- But wasn't he demoted before? No, Your Honor. The demotion also happened? The demotion also happened after this particular ---- I believe it happened after this particular incident regarding the realignment and reassessment of the programs, wherein they restructured and temporarily eliminated all the divisional director positions and made everybody a program manager. Subsequent to that, that's when the evaluation came. And I believe that's when Mr. Parker was demoted. So that's October 13th, 2008, according to my notes. And so when was ---- I thought that Mr. Nielsen wasn't terminated until long after that. He was terminated in December of 2008, Your Honor.  So that demotion actually did occur before he was terminated. The demotion of Mr. Parker? Right. I misunderstood. That's correct, Your Honor, it was. Based on his failure to supervise, his failure to conduct appropriate supervision of Mr. Nielsen, his PIP, his flawed PIP program, which exposed the company to potential liability, that's what you're referring to. Right. And so if Parker had a motive, like I want to get Nielsen fired, say, let's just assume that. But the company seems to reject that in that sequence of events in October 2008. So how does that ---- how does whatever retaliatory motive Parker has then affect the company? How do we make that connection? Sure, Your Honor. Well, there's other cases, and we've cited in our briefs, that basically hold the company, I wouldn't say directly liable, but certainly vicariously liable for the actions and conduct of its supervisors. Here we have in June and July of 2008 my client going to the HR department and complaining about a perceived retaliation, a perceived discrimination, a hostile work environment. The company then failed to avail itself or implement its own written policies to conduct an investigation onto that, and essentially let Parker continue down this road. The President then observed Parker engaging in a questionable lunch with the subordinate employee, Ms. Kaushimer. In August of 2008, I believe it was, the Vice President met with Mr. Parker at the baseball game and basically raised an issue stating, I've heard a rumor that you're having an affair. That's none of my business, but let's not go there. So there are ample instances where the company itself knew about what was going on. My client had complained he had utilized the reporting system that was required of him and therefore was expecting not only Mr. Parker's conduct to change, but to come in to respond accordingly, which never happened. And instead, he was left under Mr. Parker's will and conduct and was driven out of the company based on Mr. Parker's actions, which were, I would say, not only implicitly supported, but directly supported by the company because of their lack of intervention. Moving forward to the pretext that Justice Thomas asked me to comment upon, looking further at the contract itself, my client had nothing to do with this Defense Language Institute contract. In fact, in Mr. Parker's evaluation, the Vice President pointed out that this contract was managed very poorly by Mr. Parker. In fact, ten people that had worked with him on this contract had complained of his mismanagement and his inability to carry even the most simple tasks out. My client, again, had nothing to do with it. They have offered no justification specifically addressing why they singled him out as opposed to Mr. Parker, who had already been disciplined in October 2008, who had already been warned about his performance regarding this particular contract, and yet it continued. And they have articulated no specific reasons why they acted upon my client. And in addition, there's five other acts of retaliation that were raised in our brief, none of which were addressed in the Pele's brief as to why or what legitimate reason they had for implementing or for actually allowing that to go. And that's the failure to report or failure to conduct investigations, Mr. Parker's conversation with my client in the vehicle, where he basically told him to get in line, the subsequent PIP programs, which my client received all green lights except for the last one, and for some reason unknown to anybody but Mr. Parker. That was grounds to terminate my client. And, again, those issues were discussed in our brief, and I don't want to take much more time over that. The people who actually made the decision to terminate Mr. Nielsen, there were three of them involved, isn't that right, the President, Vice President, and HR person? Yes, Judge. I believe when I took the President's deposition, she said she had the ultimate decision-making authority, and it was her decision, although the other two had inputs, ultimately it was her decision to terminate. In the letter reprimanding Parker, they say that he's put them in a vicarious position. So it sounds like they were sensitive to upstream motivation imputation at that time. Have they argued or did they argue below the issue of the President made a totally independent decision without relying at all on Parker's evaluations? I don't think that was ever clarified, Your Honor, I don't. And I think something that's strikingly important here is long after this case had evolved, long after my client had terminated, in fact, after the complaint had been filed, Ms. Padone went back and restructured a memo to basically CYA that basically listed all the grounds that they used to terminate my client, none of which were ever discussed or presented in the deposition of Ms. Padone, and that's what I'm talking about. I'm not talking about the evidence that I have in the case of the President or referred to in any other document prior to my client's termination. So I'm not exactly sure what the grounds were and who made the ultimate decision to terminate my client and what they relied on. All I can say from the evidence that I know is that it was the President's decision to terminate my client. And that's all I can offer the Court right now. I don't – I can't say anything else. If you have a little less than two minutes left, do you want to reserve it? I'd like to reserve it if I could, Your Honor. Thank you very much. Good morning, Your Honors. May it please the Court. My name is Torrey Griffin. I represent the Appalese defendants below. Like Mr. Poirier, I would like to also focus my comments this morning on the retaliation aspect of this case. I do think that is the heart of Mr. Nielsen's case, and I think the comments are appropriately addressed there. There was a long history with Mr. Nielsen of his performance problems within this company. Those performance problems and the timing of those performance problems are critical to evaluating the pretext and the burden-shifting analysis here, and they're critical to understanding why the plaintiff here has nothing more than a showing of mere temporal proximity in order to establish pretext. Well, I would quarrel with that characterization. But just to focus the issue, I'd come back to the point I just raised with counsel. We have case authority in this circuit where if there is clear bias by a supervisor, any upstream imputation, you can break the causal connection and so on. But I don't see if the ultimate decision-maker can be shown never to have been aware of or taken the supervisor's biased evaluations into account. I don't see that argument, nor do I see the facts that support it here. If you argue that there's, even assuming that we were to find that Parker, there's enough to create a tribal issue about his animus and retaliatory intent, that there is no link to the ultimate decision between his actions, his evaluations of Mr. Nielsen and the like, to suggest that he had nothing, even if we were to assume, just for purposes of a summary judgment motion, that he was clearly biased and retaliating, that the termination decision had nothing to do with it? Just for purpose of argument, I will concede that your assumption that Mr. Parker might have had a retaliatory bias, I don't agree with that conclusion, but I'll assume that for purposes of answering your question. The answer is, we have argued, based on the evidence, that once TTI lost, was informed that it was going to lose the DLI contract in September-October of 2008. It protested that decision. There was a protest period. It was finally indicated in December of 2008, they learned that they had lost that protest. In the meantime, the discussion about how to reorganize the company, in light of the loss of the largest service provider contract this company had, and the biggest reorganization it had ever gone through, that discussion as to how to reorganize and which positions to eliminate, occurred between Yvonne Glenn, the President, Troy Glenn, the Vice President, and to some extent involved Brenna Padone as HR Director. The decision to eliminate one of the five program manager positions, and the decision to eliminate the two division director positions, which were the two positions that were directly above the program manager decisions, and both of those individuals moved down, resulting in displacement of essentially three program managers, those decisions were all made by Yvonne Glenn and Troy Glenn. The decision ultimately to refuse the further extension of the leave of absence to Mr. Nielsen, consistent with company policy, the fact that the company had never allowed anybody to have a leave of absence greater than 60 days. There's no evidence to the contrary. Company policy was clear on that. The written policy and the policy as applied. Those decisions, Your Honor, were all made by Yvonne Glenn, the President, in consultation primarily with the Vice President, Troy Glenn. So have we argued specifically citing cases that Mr. Parker had no involvement in those decisions, and therefore, as a matter of law, the imputation doesn't occur? The answer, candidly, is no, Your Honor. But we have argued that based on the evidence, and that's what the evidence supports below. Yeah, but we're on summary judgment, and the issue is a tribal issue here. And to revert to Judge Thomas's question about pretext, there is proximity, there is the history of Parker going after Mr. Nielsen. He asked, I believe the evidence is, or at least there's some evidence, that he asked Kelseymer to see if he or she could dig up any dirt on him. He was put under close surveillance by Parker. There's the, you know, Parker told Nielsen to get in line and quit causing ripples. So, you know, I find it difficult to say that what you accepted arguendo isn't clearly a factual issue for the jury as to animus, retaliatory animus, by Parker, and I have trouble then squaring your argument with the notion that there isn't enough to go to a jury to let the jury decide whether the loss of contract and so on and so forth, it just became convenient to target Mr. Nielsen as the one who had to go, even assuming somebody had to go, that he was the one targeted because of retaliation for his causing ripples in the company. Well, let me address that then, Your Honor. And again, a moment ago I conceded for purposes of answering your question that there was a retaliatory animus on the part of Mr. Parker, but I don't believe the evidence supports that in the context of the burden-shifting analysis that's applied here. And what I opened my comments today with were there's a history of performance issues, and those performance issues went back to the time when Mr. Nielsen was account executive. That was why he was transferred by Yvonne Glenn and Troy Glenn to the position of program manager. He admittedly clashed with Mr. Parker early on. There's evidence in the record that Mr. Parker criticized his job performance as early as January 2008 in a written evaluation. There was evidence that by May of 2008, Mr. Parker was reporting to his next up in chain of command, the Vice President Troy Glenn, about problems with Mr. Nielsen's performance. There's substantial evidence in the record, including Mr. Nielsen's own admission, that in the context of the California National Guard proposal, that Mr. Nielsen poorly led the proposal team, and it showed. There's evidence in the record that after that proposal was done, and on June 11, 2008, Yvonne Glenn, the president of the company, sat down with him, went through a long discussion with him, criticized his performance personally on that proposal. The timing of that is all critical, and it's all critical because the only evidence we have of any complaint for purposes of any retaliation, and therefore any retaliatory animus, didn't come until later June of 2008. So what we have then is a carry forward from that point on of the continued performance issues into June and July of 2008, and even in the context of the performance improvement plan and immediately prior to that. Who put him under the performance plan? That was Mr. Parker at the direction of Troy Glenn. And Troy Glenn at one point, I think in 2007, described Nielsen as one of the true future leaders of TTI? That was in his position as the prior, as the account executive, and he was talking to Mr. Nielsen, if you look at the deposition testimony, in the context of moving him over and attempting to motivate him to do well in his new position. He was not a good salesperson, and that's exactly why they were trying to move him into the program manager position, to give him the ability to succeed. So even in the context of the performance improvement plan, you have evidence in the record that one of the main issues was missed deadlines in that context, and you have evidence in the record that even in the context of that performance improvement plan, Mr. Nielsen was still missing deadlines. He had one that came and went. He didn't ask for an extension, and then he got a new deadline, and he still failed to meet that additional deadline. Judge Ikuda was correct in questioning of my colleague that TTI did ultimately discipline Mr. Parker in October of 2008 for essentially faulty execution or poor documentation of this. The company, to your Honor's point, the company did step in and say, we are not going to terminate Mr. Nielsen based on this record. And it's at that point, and that was the first time, that Mr. Nielsen came forward and talked to the President and said, I have all this dirt on Mr. Parker, and look at all these e-mails I have. And then he goes out on leave. And he goes out on leave for 30 days with no indication of when he's coming back. Did anybody question, or is there any evidence, what Mr. Glenn meant when he wrote that disciplinary memo to Mr. Parker and said that he had put TTI in a precarious position? No, Your Honor. My reading of that is that it should have been precarious, but I don't recall anybody asking Mr. Glenn specifically about what he meant in that context. I thought the same thing when I read a copy of it. But I went to the memo, and precarious is precisely what he said. And it's hard to say that's a typo. Whether or not it is, Your Honor, I think it would be too vague in any event to be considered something akin to an admission against liability.  Well, I'm not saying that they're admitting liability, but they certainly were aware that Mr. Parker had done things, apparently, that put them in a bad position, precarious or otherwise. Well, certainly with the relationship with Ms. Keltreimer, whatever that may have been, that was one of them. Well, this is talking about Mr. Nielsen in this paragraph, not... Correct. She didn't have anything to do with Mr. Nielsen and his activities with regard to Mr. Nielsen. I understand that's the motivation and everything, but in the context of that memo, I don't see what your explanation... Well, my explanation is I think that it's fairly simple, that he didn't do his job as a supervisor to provide proper documentation, and that's exactly why the company stepped in when the company did. And I also would like to point out one thing that I think is critical, and that is, to your Honor's statement earlier about the quick-causing ripples-and-get-in-line comment that Mr. Parker made to Mr. Nielsen, there's no context for that whatsoever. There was Mr. Nielsen admitted that the only inference he could make based on Mr. Parker's body language and tone, which seems to be a repetitive theme for Mr. Nielsen in this case, is that Mr. Parker was referring to Mr. Nielsen causing ripples in the context of reporting the relationship with Ms. Kelchheimer. There's no evidence at all that Mr. Parker, that he admits he never talked to Mr. Parker about that directly, and there's no other evidence at all that Mr. Parker ever knew that Mr. Nielsen made any complaints to HR or otherwise. He was confronted by Troy Glenn in August and told to stop. By that point, all evidence in the record indicates that whatever was going on, e-mails between June and July, had stopped, and we have Mr. Nielsen admitting that whatever adverse actions he was suffering in the context of the workplace, i.e., having to do Ms. Kelchheimer's work, had stopped by June of 2008. So we have no evidence of anything continuing with respect to impacts on Mr. Nielsen's workplace. The final thing I'd like to address is another piece of evidence that Judge Fisher mentioned, was that the evidence that Mr. Parker was supposedly digging up dirt, and I think it's in the record, Appellant's Excerpt to Record at 174, which was Exhibit 20 to Mr. Poirier's declaration below, that piece of evidence and that argument was never made to the district court, and therefore it's waived. Now, how do I know that? The Eastern District of California has the rule, the separate statement rule, et cetera. In the record, we have included the separate statement, the defendant's separate statement in support of the motion, the plaintiff's additional statement of facts in opposition to the motion. Exhibit 20 is nowhere cited anywhere. The electronic docket's available to the court. That argument based on that piece of evidence is nowhere in the appellant's brief below. In any event, that particular e-mail floating out there says nothing. When you look at the e-mail to suggest that it reaches the level of digging up dirt, which was discussed in the Yanowitz case in front of the California Supreme Court, where there the management encouraged the supervisors to talk to other people, to talk to other people to dig up as much dirt as they could with respect to this particular individual. One e-mail at page 174 of the record doesn't say any such thing. It doesn't support any such evidence in the context of this case. And I see that my time is up, unless Your Honors have any questions. Thank you very much. Thank you, Counsel. Again, good morning. In the brief time that I have, I just want to talk about the performance issues that were raised by my colleague. First, it was mentioned by my colleague that TTI's decision to put Nielsen on PIP was made by both Mr. Parker and Mr. Glenn, Vice President. That's not true. The record clearly is an opposite and, in fact, contradicts that. When Mr. Glenn and Ms. Padone were asked and volunteered in an evaluation of Mr. Parker, that this was simply a pretext offered by Mr. Parker in which to terminate Mr. Nielsen. So they expressed concerns when they found out about this unauthorized PIP when my client was basically terminated in October, early October of 2008. Counsel also discussed my client's poor work performance. Quite the contrary. The history, the written documented history, speaks volumes, as well as the admissions of the President and the Vice President who both admit that the documentation of my client's alleged poor work performances is pretty much nonexistent throughout his course of employment. What is in existence is an evaluation a month after Mr. Parker took over as my client's supervisor wherein he evaluated my client on an average of 3.5, 3 being needs expectations, 4 being exceeds expectations, and went on to write all kinds of glowing comments. Of course, there were comments in there that expressed some need for my client to improve in certain areas, but overall the evaluations were significantly positive. It wasn't until this last PIP that my client was exposed to, this red light that came out of nowhere, that my client is now being accused of not being a good performer. So I just wanted to clarify that issue up with the Court. And I see my time is almost up, and I don't want to take any more of it unless the Court has questions. Thank you. Thank you both for your arguments. The case is argued to be submitted for decision. Very helpful arguments this morning, both of you.
judges: Thomas, Fisher, Ikuta